

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
05/24/2012

| | |
|---|---|
| **Dennis Faulkner, Plaintiff,** § § § | |
| v. § § | Miscellaneous Proceeding 10-301 |
| **Gary Kornman, et al, Defendants.** § | |

## MEMORANDUM OPINION

Kornman must compensate Faulkner for the reasonable legal fees incurred as a result of Kornman's contempt of the April 9, 2012 Amended Order, (ECF No. 719).

### Factual Background

This Memorandum Opinion concerns only one dispute in a long and complex case. Other Memorandum Opinions present detailed background on the matter in its entirety.

In late September 2011, Mims (the Receiver) requested documents from Clary, Kornman's newly hired counsel. (ECF No. 575 at 2). In essence, Mims requested documents indicating the manner in which Clary would be paid. Mims had authority to request the documents pursuant to a September 16, 2010 Turnover Order, (ECF No. 165).

Kornman did not turnover the requested documents. Faulkner (the Trustee) filed a motion to compel on January 11, 2012. (ECF No. 575). The motion was granted on February 9, 2012. (ECF No. 616).

Clary, on Kornman's behalf, turned over responsive documents on February 14, 2012. (ECF No. 632 at 4). Included were various checks and wire transfer documents with redacted account numbers. Clary admitted knowingly turning over redacted documents. (ECF No. 632-6). Clary and Kornman refused Faulkner's request for nonredacted documents.

Faulkner thereafter filed a motion for contempt against Kornman and Owen, Clary, & Aikens, LLP (Clary's law firm). Immediately upon reading the motion, the Court ordered Kornman and Clary to produce nonredacted documents. (ECF No. 636). A hearing was set for March 7, 2012 on the first motion for contempt.

In response to the order to produce nonredacted documents, Clary "produced what he believed at the time to be complete and unredacted copies of all checks evidencing payments to the Firm by any judgment debtor and/or the source of payments to the Firm." (ECF No. 657 at 5). One of the checks was still missing its account numbers. (ECF No. 680-9 at 3). After Faulkner pointed this out, Clary had Kornman secure a copy of the nonredacted check from his bank. (ECF No. 680-11). The final nonredacted copy of the check was not produced until March 5, 2012. (ECF No. 680-11).

The March 7, 2012 hearing focused only on the motion for contempt as to Owen, Clary, & Aikens, LLP. Due to Clary's immediate compliance with the order to turnover nonredacted documents,[1] the Court did not find Clary in contempt and simply expressed disappointment with his initial decision. (ECF No. 666 at 41-43).

Faulkner was allowed to refile the motion for contempt only as to Kornman. In addition to the allegations of material alterations to evidence, the contempt motion alleged Kornman repeatedly violated a court injunction by violating a $9,000.00 per month personal spending limit imposed by the Court. (ECF No. 680 at 8). A hearing was set for April 5, 2012.

Kornman provided no defense for his alteration to the check, as the following excerpt from the hearing demonstrates:

---

[1] Clary immediately complied with this order. Kornman did not. Clary turned over all documents in his possession in the form in which he received them originally from Kornman. Amongst those documents was the check with the account numbers still missing. The missing check numbers came from alterations by Kornman before he handed the check to Clary. When Clary later pressed Kornman (after Clary was pressed by Faulkner), Kornman secured a nonredacted copy of the check. This portion of the delay, therefore, was entirely due to Kornman's actions.

> Court: Let me cut this short. Here's the two issues . . . I don't understand how the taxes get paid out of a nonexempt account into exempt. And I have no evidence that they got reimbursed by a trust. And number two, I don't understand why the $15,000.00 check account numbers and bank name were redacted by Mr. Kornman, which hid the essential information from the check. Those are my two concerns. . . .
>
> Clary: The $15,000.00 check is what was given to me . . . .
>
> Court: Right.
>
> Clary: And I produced . . .
>
> Court: No, I'm worried about why Mr. Kornman gave you one that . . .
>
> Clary: He gave me that, and I contacted him when Ms. Frazier contacted me and said "I don't think this is the unredacted check." I contacted him immediately and I said "Is this the unredacted check?" And he said: "I don't know." That was his response. And I said: "Well you need to go to the bank and get the check."
>
> Court: Yeah, I've got a very sophisticated guy here and somebody went to the trouble to redact it. And I don't understand why that wasn't in contempt of our order.
>
> Clary: I don't know either. I don't know why it was given to me in that form. I have no idea.

(April 5, 2012 Hr'g 11:03:25 – 11:04:55). Kornman's redaction was an intentional violation of the order.

Faulkner was awarded $5,000.00 for legal fees spent relating to the first contempt motion. As an additional sanction, the Court ordered Kornman to promptly pay the $5,000.00 for the legal fees in addition to $40,000.00 towards Kornman's outstanding sanctions.[2] (ECF No. 711). Evidence produced at the hearing indicated Kornman had the capacity to promptly pay $45,000.00, despite repeated sworn assertions to the contrary. (ECF No. 711).

The initial deadline was April 9, 2012. (ECF No. 711). Kornman filed an emergency motion and requested an extension. (ECF No. 718). The Court granted Kornman a partial

---

[2] As an accommodation, the Court gave Kornman the option of applying the funds either to his outstanding sanctions or to the underlying judgment issued by the Bankruptcy Court for the Northern District of Texas.

extension and amended its order. (ECF No. 719). The amended order required Kornman to pay $20,000.00 by April 10, 2012 and the remaining $25,000.00 by April 19, 2012. (ECF No. 719). Kornman tendered a Citicard check for the $20,000.00 to Faulkner in a satisfactory manner.[3]

On April 19, 2012, Kornman filed a second emergency motion and requested another extension. (ECF No. 733). This second emergency motion was denied. (ECF No. 736). Kornman tendered Faulkner another $10,000.00 Citicard check by the April 19 deadline, but failed to timely pay the remaining $15,000.00.

Faulkner thereafter filed a second motion for contempt[4] on April 20, 2012. (ECF No. 737). A hearing was set for April 26, 2012. The day prior to the hearing, Kornman tendered Faulkner a final Citicard check in the amount of $15,000.00. At the time of the hearing, therefore, Kornman was no longer in contempt of the order.

Faulkner continued to request that his legal fees for the contempt be paid by Kornman. The Court requested briefing as to whether Korman should be required to reimburse Faulkner for legal fees related to the second contempt motion.

## Analysis

At the April 26, 2012 hearing, the Court ruled merely that Kornman was not in contempt as of the hearing. The Court did not rule whether Kornman was previously in contempt at any time.

The "movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required certain

---

[3] Kornman tendered the $20,000.00 on April 11, 2012 (that is, one day after the deadline set by the Court) pursuant to an agreement with Faulkner. (ECF No. 734 at 2).

[4] Many contempt motions have been filed over the course of this miscellaneous proceeding. The phrase "second contempt motion" indicates that it is the second contempt motion filed in this discrete dispute, not in the entire miscellaneous proceeding.

conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enter.*, 826 F.2d 392, 401 (5th Cir. 1987) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). After the movant makes such a showing, "the respondent can defend against it by showing a present inability to comply with the subpoena or order." *Id.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)).

It is undisputed that a court order was in effect, requiring Kornman to make a total of $45,000.00 in payments by April 19, 2012. It is also undisputed that Kornman did not timely comply with the order.

It is disputed whether Kornman had the ability to timely comply with the order. On this issue Kornman, not the movant, has the burden of production. *Rylander*, 460 U.S. at 757. "In order to show inability to comply with a court order, a party must: (1) explain categorically and in detail why; (2) show the inability was not self-induced; and (3) demonstrate it made in good faith all reasonable efforts to comply." *Select Portfolio Servs., Inc. v. Galindo (In re Galindo)*, 2006 U.S. Dist. LEXIS 53077 (S.D. Tex. July 31, 2006).

Kornman admitted one exhibit into evidence at the hearing on April 26, 2012. (Def. Ex. 3). This was a letter accompanying the final $15,000.00 check,[5] thanking Kornman for being a Citibank customer. The letter and the check are dated April 17, 2012. (Def. Ex. 3).

**Kornman as a Witness and Litigant**

Kornman has severely compromised his credibility through repeatedly contumacious behavior. He lied under oath. (ECF Nos. 509 & 711). He withheld evidence and encouraged others to do the same. (ECF No. 509 at 3, 8, 10) He materially altered documents in order to hide relevant discoverable information. (April 5, 2012 Hr'g 11:03:25—11:04:55). Kornman's

---

[5] This was the check Kornman negotiated over to Faulkner on the eve of the April 26, 2012 contempt hearing.

actions damage his credibility to such an extent that his statements are almost entirely lacking in credibility when not bolstered by separate credible evidence.

**Kornman's Account of the Events**

The original April 5, 2012 order required Kornman to pay $45,000.00 by 12:00 pm on April, 9, 2012. (ECF No. 711). On April 6, 2012, Kornman contacted Gardere Wynne Sewell LLP ("Gardere") and offered to charge the entire $45,000.00 to his Discovercard. (April 26, 2012 Hr'g 9:47:35). Told the firm did not take Discovercard but did take Visa and Mastercard, Kornman used a balance transfer check[6] from Discovercard to transfer $25,000.00 to a Citicard account. (April 26, 2012 Hr'g 9:47:45—9:47:53). Kornman, believing a Visa or Mastercard would be acceptable to Gardere, claims that he planned to charge the Citicard (a Visa) for the entire $45,000.00 in sanctions. (April 26, 2012 Hr'g 9:48:01). Subsequently Kornman was told that Gardere would not accept a credit card charge. (April 26, 2012 Hr'g 9:48:22).

On April 9, 2012, the initial deadline, Kornman sought the first extension. (ECF No. 718). The Court granted the extension in part. (ECF No. 719). Kornman had two Citicard balance transfer checks. (April 26, 2012 Hr'g 9:49:07) The maximum amount that may be written on these balance transfer checks is $20,000.00 per check. (April 26, 2012 Hr'g 9:49:14; Pl. Ex. 2). Kornman wrote a $20,000.00 check and sent it to Gardere. (April 26, 2012 Hr'g 9:49:12).[7]

---

[6] The terms "balance transfer checks" and "cash advance" checks were at points used interchangeably by the parties. When the Court uses the term "balance transfer checks" it is referring to checks which allowed Kornman to choose the initial payee. (*See, e.g.*, Pl. Exs. 1 & 2). On the other hand, "cash advance checks" are those which are made out to Kornman as payee which he must then negotiate. (*See, e.g.*, Def. Ex. 3). Describing these checks in this shorthand is the way the parties appeared to distinguish these two types of checks.

[7] Kornman stated that all of the Citicard balance transfer checks he had were limited to $20,000.00. (April 26, 2012 Hr'g 9:49:12). The second Citicard check, written in the amount of $10,000.00, does indicate it is limited to $20,000.00. (Pl. Ex. 2). The first Citicard check, which Kornman wrote in the amount of $20,000.00, contains no limitation on its face. (Pl. Ex. 1).

Kornman had one additional check remaining, which had a $20,000.00 limit. (Pl. Ex. 2). Kornman still owed $25,000.00 in sanctions. Kornman therefore contacted Citicard about getting additional checks. (April 26, 2012 Hr'g 9:49:20). Citicard told Kornman they do not sent out balance transfer checks upon request. (April 26, 2012 Hr'g 9:50:02). Kornman told Citicard he needed a total of $25,000.00 and asked what to do. (April 26, 2012 Hr'g 9:50:08). Citicard told Kornman to write the one remaining balance transfer check out for $10,000.00 and that they would send him a cash advance check in the amount of $15,000.00.[8] (April 26, 2012 Hr'g 9:50:23). Citicard warned it would take up to ten business days for the approval process related to the $15,000.00 cash advance check. (April 26, 2012 Hr'g 9:50:28).

Kornman notified Clary regarding the need for additional time. (April 26, 2012 Hr'g 9:50:45). Clary then filed the first emergency motion for an extension. (ECF No. 718). The Court extended its deadline to April 19, 2012 as to $25,000.00. (ECF No. 719). Kornman tendered a $10,000.00 check to Faulkner by the later deadline but had not yet received the $15,000.00 check from Citicard. (ECF No. 733 at 2). As the $15,000.00 check did not arrive by the later deadline, Kornman filed the second emergency motion for an extension. (ECF No. 733 t 2). This motion was denied, (ECF No. 734), precipitating Faulkner's second contempt motion, the contempt hearing, and the present Memorandum Opinion.

**"All Reasonable Efforts to Comply"**

The evidence shows Kornman did not in good faith make all reasonable efforts to comply with the order.

The reasonableness of Kornman's decision to attempt to use a credit card to cover the sanctions was addressed by the Court at the April 26, 2012 hearing:

---

[8] As discussed in further detail later in the opinion, this testimony is inconsistent with statements in motions previously filed by Kornman. (ECF No. 733 at 2).

> It certainly was not consistent with the order to try and charge [the sanctions payment]. . . . Charge cards you can protest, you can charge back, there's a fee to the person receiving the charge. This wasn't a check, this wasn't cash, this wasn't a wire transfer. For someone as sophisticated as Mr. Kornman to believe he could charge sanctions . . . was not reasonable compliance with the court order."

(April 26, 2012 Hr'g 9:43:00).[9] This decision was even more unreasonable given that Kornman, when he attempted to charge the sanctions, had an unquestionably valid method of payment.

Kornman had a Discovercard balance transfer check he could have used to pay Gardere $25,000.00 directly.[10] This is in addition to the two Citicard balance transfer checks Kornman had, one of which he used to pay Gardere $20,000.00 soon thereafter. (Pl. Ex. 1). On the date the sanctions were issued, Kornman could have written checks directly to Gardere in the total amount of $45,000.00.[11] That he chose not to do this and attempted to charge the $45,000.00 instead is simply not reasonable.

There is a separate, and even simpler, reason why Kornman's defense fails. Kornman never successfully explained the decision not to draw on his other lines of credit.[12] When asked

---

[9] Regarding the fee for using the creditcard, Kornman testified that he offered to increase the amount charged so that Gardere would net $45,000.00. (April 26, 2012 Hr'g 9:48:12). This testimony was not separately corroborated.

[10] Kornman used this balance transfer check to send $25,000.00 from his Discovercard line of credit to his Citicard line of credit. When questioned by the Court, Kornman did not state that this check couldn't have been written to Gardere directly. (April 26, 2012 Hr'g 9:53:38).

[11] There is no evidence Kornman was incapable of writing a $20,000.00 check to Gardere using one of the two Citicard checks he had in his possession. Kornman did testify that the $25,000.00 Discovercard transfer was necessary in order to prevent complications (such as fraud alert) from interrupting the $45,000.00 charge to his Citicard he initially contemplated. (April 26, 2012 Hr'g 9:52:59). Kornman did not testify this Discovercard transfer was necessary to cover a $20,000.00 check using one of the two Citicard checks. Even if Kornman had so testified, the evidence shows otherwise. (ECF No. 731-1 at 18). This printout shows an "Available Credit Line" of $67,184.69 on this particular Citicard account. (ECF Doc. 731-1 at 18). Kornman testified that the credit line reflected in this printout was the credit line into which he deposited the $25,000.00 Discovercard check and from which he wrote the initial $20,000.00 Citicard check to Gardere. (April 26, 2012 Hr'g 9:55:18 – 9:55:36). Even if the balance transfer check from Discovercard increased his "Available Credit Line" on this Citicard account by $25,000.00, Kornman still had an "Available Credit Line" in excess of $42,000.00 prior to the Discovercard transfer.

[12] Kornman has at least eight known lines of credit: three with Citibank, two with Bank of America, and one each with Wells Fargo, Discover Card, and BBVA Compass. (Pl. Exs. 3A – 3H).

at the hearing whether he contacted Wells Fargo about drawing on that line of credit Kornman responded: "No, sir, I was trying to get $45,000.00 as quickly as possible." (April 26, 2012 Hr'g 9:41:46).

This response makes no sense. Someone attempting to get $45,000.00 as quickly as possible, who has access to multiple lines of credit, would try and use every single credit line available. It is not as if Kornman only had a few hours to comply[13] and had to choose one line of credit on which to focus his efforts.

Kornman never explained why, after learning[14] it would take up to additional ten business days for Citicard to approve and send to him the final $15,000.00 check, he didn't attempt to draw on other lines of credit in an effort to ensure timely compliance. When asked whether he could have drawn on other Citicard lines of credit (in an attempt to avoid the delay), Kornman stated: "I had already paid everything but the $15,000.00 so that's the only [line of credit] I needed. So I didn't ask about the others." (April 26, 2012 Hr'g 10:03:25). Kornman similarly admitted that he did not attempt to contact any of the credit card companies besides Citicard. (April 26, 2012 Hr'g 10:03:40).

There is an important inconsistency that should be noted. Here, in attempting to make it appear reasonable to not attempt to draw on other lines of credit, Kornman stated it was unnecessary to do so because the $15,000.00 check from Citicard was on its way. The second emergency motion, however, took care to stress that it was yet uncertain whether Citicard would

---

[13] Accounting for the amendments to the order, Kornman had four days to come up with $20,000.00 and fourteen days to come up with the remaining $25,000.00. (ECF Nos. 711 & 719).

[14] Kornman's second emergency motion listed April 13, 2012 as the date he learned of this information. (ECF No. 733 at 2). Kornman's testimony at the hearing was that he requested the $15,000.00 check immediately after sending Gardere the first check for $20,000.00. (April 26, 2012 Hr'g 9:51:25). The first check was given to Gardere on April 11, 2012, (ECF No. 734 at 2), so it is possible that Kornman learned of this as early as April 11, 2012. In any event, even by the later date of April 13, 2012, Kornman had sufficient notice of this complication.

ever approve and send Kornman the $15,000.00 check. (ECF No. 733 at 2) ("Accordingly it will be ten business days before Citicard <u>may</u> approve the $15,000.00 cash advance check allowing Kornman to comply with the Court's order.") (emphasis in original). This indicated uncertainty is inconsistent with Kornman's testimony at the hearing.

There is another inconsistency related to timing. Kornman testified that he initially thought the $15,000.00 check would arrive in time for him to meet the deadline—another reason given for not attempting to draw on other lines of credit. (April 26, 2012 Hr'g 9:51:59).

The testimony, again, conflicts with Kornman's prior assertions because Kornman previously indicated he was uncertain whether Citicard would send a check at all. (ECF No. 733 at 2). Furthermore, even if Kornman did know the check would be sent at some point, it was unreasonable to assume timely compliance was likely after being told sometime between April 11 and April 13, 2012 that the approval process could take up to ten business days. At the earliest, if Kornman spoke with Citicard immediately after giving Gardere the $20,000.00 check at 12 pm on April 11, 2012, this left less than eight total days for compliance (and only six business days). It was unreasonable to assume that eight days, let alone six, was likely to be enough time for the check: (i) to be approved; (ii) to be processed and mailed to Kornman; (iii) to arrive in the mail at Kornman's residence; and (iv) to be retrieved and turned over by Kornman to Gardere by 12 pm on April 19, 2012.

In sum, sometime between April 11 and April 13, 2012, Kornman knew or reasonably should have known the $15,000.00 check was unlikely to arrive before the deadline—if it arrived at all. Yet, Kornman made no attempt to draw on any other lines of credit in order to secure timely compliance. This does not satisfy Kornman's burden of proof requiring him to demonstrate that he made all reasonable efforts to comply.

**Reasonableness of the Trustee's Legal Expenses**

Sanctions for contempt may include forcing the contemnor to pay the other party's reasonable legal fees resulting from the contemptuous conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). It is therefore necessary to decide whether it was reasonable for Faulkner to file the second contempt motion.[15]

The Court finds Faulkner's actions to be entirely reasonable.

Kornman argues Faulkner's contempt motion was unnecessary because "the final check for $15,000 was mailed to Kornman *two days before the deadline and three days before the Creditor Trustee ever filed its motion to hold Kornman in civil contempt*." (ECF No. 760 at 4) (emphasis in original). Although this may be a true statement, it does not appear Faulkner was aware of these facts. Kornman's second emergency motion specifically said the following:

> On or about April 13, 2012, Kornman requested an additional $25,000 from a credit card that Kornman has with CitiCard. Korman was told by a CitiBank supervisor that he had $10,000 available from a credit card for which he could presently write a check, but that a check for Citicard's cash advance of any additional funds would require a review of his credit card accounts. Kornman has now been advised that the review of his credit card accounts for any cash advance will take an additional ten business days, but is out of Kornman's control. Accordingly, it will be ten business days before Citicard <u>may</u> approve the $15,000 cash advance check allowing Kornman to comply with the Court's order.

(ECF Doc. 733 at 2) (emphasis in original).

This paragraph does not tell Faulkner the check is definitely on its way. It says that, after a delay of up to ten business days, Citibank may send Kornman a $15,000 check. Kornman does

---

[15] Kornman and the Trustee addressed the issue slightly differently in their briefing, focusing on the question of whether or not legal fees may be shifted even when the party at fault is not found in contempt. Such a situation would hinge on the factual question of whether the contempt motion compelled compliance. However, the Court only previously decided that Kornman was not in contempt at the time of the hearing. As stated above, the Court finds Kornman was in contempt of the order from the April 19, 2012 deadline until he handed over the $15,000.00 check. The question now is simply whether, even taking into account Kornman's contempt, it was reasonable for the Trustee to file a second contempt motion and incur the resulting legal expenses.

not mention attempts to draw on other lines of credit, and it was natural for Faulkner to assume that no such efforts were being made.[16]

Faulkner's actions must be viewed in light of the history of this miscellaneous proceeding. Kornman's litigation tactics have made it such that even basic requests by the Trustee or the Receiver require motions to compel and/or contempt motions. It was entirely reasonable for Faulkner to assume that Kornman's full compliance with the order would not be obtained without a contempt motion.

**Amount of Legal Fees[17]**

Faulkner's counsel) submitted an affidavit indicating $6,041.00 in legal fees were spent compelling Kornman's compliance with the April 9, 2012 Amended Order. The Court asked Kornman if he would stipulate on the issue of whether this amount would be reasonable for these legal services in the event it was later determined it was reasonable to incur any legal fees at all. Kornman indicated he thought this amount was likely a reasonable amount for these services but noted the lack of contemporaneous time records.

The Court therefore ordered Faulkner's counsel to submit to Kornman contemporaneous time records within seven days. Kornman was ordered to stipulate to or challenge the records within seven days thereafter. Kornman's brief neither stipulates nor challenges these contemporaneous time records. (ECF No. 760). Kornman has not, therefore, properly objected as to the reasonableness of this amount in legal fees for these services.

Kornman did properly object to the reasonableness of incurring any legal fees whatsoever. This Memorandum Opinion overrules that objection.

---

[16] Kornman later testified that, indeed, no such efforts were made. (April 26, 2012 Hr'g 10:03:40).

[17] Unless otherwise noted the facts from this section are taken from the last few minutes of the April 26, 2012 hearing.

Kornman must compensate Faulkner for the $6,041.00 spent compelling Kornman's compliance with the April 9, 2012 Amended Order. Compliance will be required within 15 days.

## **Conclusion**

The Court will issue a separate order in accordance with this Memorandum Opinion.

SIGNED **May 24, 2012.**

                                                                  Marvin Isgur
                                            UNITED STATES BANKRUPTCY JUDGE